And we'll turn to counsel in Pruter v. Local 210 Pension Trust Fund. Thank you. Somebody left their glasses. Good afternoon. Happy Election Day. Your Honors, I represent a group of 80-some-odd former flight attendants of World Airways who were faced with a tremendous diminution of the pension that they thought they had after working for the airline for 15, 16 years when the airline went into bankruptcy in 2012. They had been working under a collective bargaining agreement since 1996, which they had been told would, then when it was negotiated, that either the airline or the union would pay for past service credits because they had all been employees of World before that and had been in a different union in a different pension fund. And then they came to discover when the bankruptcy occurred that their service prior to 1996 was being canceled, which for many of them meant a loss of two-thirds or more of their pensions. In the record, is there a July 9, 1996 letter from Local 210 discussing the $700,000? Is there? Yes. Can you give me the record so I can have it handy? Thank you. It's either 107 or 111. 112. 112 to 113. It says, I would like to explain to you the depth of the commitment this local union has to its new members with the approval of the Secretary-Treasurer. It gives pension credit to all members back to the date of hire after vesting. In other words, if you've worked for the company for 10 years, What's the record citation? It's A112. A112. And then it says, this pension plan has a cost to the union of over $700,000, which we are willing to pay to secure a better tomorrow for our members. And this was sent, this was, it was also, I think it was stated in an earlier letter. Also, on page 109, the union said that it would, it says, this is near the bottom of page 109. Furthermore, if the airline expands, the pool of members will increase and help the funding levels. There is a risk for our fellow members of Local 210, but they are willing to assume the risk for us. So they basically told the new people who were about to join their union and affirm their first, this is their first contract, that if you vote for this, we're going to assure you and the union is going to pay. If the employer doesn't pay for it, even though we've secured a promise that they'll pay for it, we're going to pay for it. And the members did that. And in return, they gave up a certain, they were also told that in return for giving up certain wages that the employer would pay for the benefit. And also they were told that at a certain time that it had been paid for. This is the allegations of the complaint. This is a 12B6 motion here.  So why is that not a violation of a duty of fair representation as opposed to a state law fraud? Because as opposed, there is a line, and this does not have to do with, we're not alleging misbehavior in the negotiation between the union and the employer. You're alleging that false promises were made to secure the ratification of the negotiated collective bargaining agreement. Well, we're alleging two things. We're alleging, A, either that a false promise was made in order to get the people to leave what they had and join something new. That's the fraud claim. And second is, there was a prompt. At this point, everyone is in 210, right? Everyone, no, they are voting whether or not to move over to a new pension. Part of it is they're giving up an old pension plan that the World Airways had and moving into a new pension plan. So they don't have a contract yet. And it's not clear from the record whether they were members. It says in the complaint that they didn't become members until after this contract was negotiated. That's what it says in the complaint. It also says, now the other claim we have is that there was a promise, not a fraudulent promise, but a promise. If the employer doesn't pay, we will pay it. That's a contractual promise. That has nothing to do with the formation or negotiation of the collective bargaining agreement. It has nothing to do with grievance handling in connection with the collective bargaining agreement. Is that language in the pension plan? No, this has nothing to do with the pension plan. This is the union's promise. Now, the pension plan talks about benefits being, past service credits being made available to people upon the payment of certain monies. Or upon the vesting of an individual. A promise to induce them to join the union. Well, the pension plan existed before. The pension plan had been in existence for, it was a multi-employer plan that had existed for many years. So they were becoming members of this plan. The plan did provide for past service credit. And the plan did provide for past service credit if the employer paid for it. And if the workers worked a certain number of years invested in the plan, then the past service credit could take effect. And the workers, the plaintiffs here, all got letters, multiple letters over the years saying, here's your benefit. This includes time back, and it goes back, whatever it was, 15 years or 20 years or 25 years. So they all were led to believe the money was paid. There was no question about their benefit. There was no reason for them until they were told that their benefit had been canceled for them to do anything. Why wasn't the trustee entitled under the terms of the plan to cancel these benefits in view of the underfunded status? Well, okay, so that goes to this section 14.5B of the plan, which is at page, I believe it's at page 91. Yeah, it's in the record at page 91. It doesn't read as simply as the, it's not as simple a language as is set forth in the brief from the pension fund, because it talks about, it says the plan shall not be liable for benefits that cannot be paid out of net contributions. And what the plaintiffs asked to do, since it had been represented to them, A, that either the union was going to pay it or it had been represented to them that the employer had paid it, they asked to see the net contributions so that they could properly assert that they were in fact, that these were benefits that could not be canceled. They were denied any access to the record, and all they were told is in a letter from counsel. There's no record before here other than in the record here. There was no record before the district court other than letters from counsel that said there were no contributions made. So 14.5B would apply if the employer did not pay for the past service credits, but I think a reading of 14.5B is not so simple that they could just cancel anything even if it had been paid for. Thanks very much, Mr. Chairman. Thank you. You've reserved some time, and I've given you some extra time. Mr. Caccacci for Local 210 Pension Fund. Good afternoon. May it please the court. My name's Anthony Caccacci of Proskauer Firm, representing the Local 210 Pension Trust Fund. There's only one claim, as you've heard from appellants counsel, brought against the pension fund. That is a claim for benefits under 502A1B of ERISA, and as we've discussed a little bit here, what the plaintiffs or appellants seek is additional pension benefits from the fund based on their past service credits. If the $700,000 had been paid, would they be entitled to these funds, I mean to the payment at the level they're seeking? A plain reading of the plan would suggest that they would not, that if the trustees in the determination, if it's determined by the trustees that it's in the interests of the plan, the actuarial and financial interests of the plan to cancel the credits, that they would be able to do that. So the plan does recognize past service credits for not only former employees of World Airways, but for presumably other employees of the fund who- They can do that even after they promised that they would be granted the past service credits? I think the promise- They can just decide not to do it? Even after they paid for the past- Even without financial distress? They could just say we're not paying it? If it is determined by the trustees that the plan is facing financial distress on an actuarial basis- That is the only basis. The plan is permitted, based on the plan terms, to cancel the past service credits. But if you assume- Even if the $700,000 had been paid? If you assume that the $700,000 had been paid, so that during this administrative process, the plan actuary went back, looked at the records, and said, oh, yes, either the union and or World or someone else did make that payment to the fund- So these people then would be similarly situated with the rest of the people in that plan? Similarly situated in the sense that, well, I don't think so, because they're still past service credits. It doesn't transform credits into current service credits. There are credits earned for a time period where the contributing employer wasn't actually contributing to the plan. So the question is, then you look at that provision, and you'll see that net contribution provision that appellant counsel pulled out, but you'll see that even if it was the case that the money was funded, which it wasn't, because that's the basis of the rest of the appellant's claims against the union, but if it was, you would do an analysis and say, okay, what are the net contributions? And here, if there was no actual funding, there wouldn't be net contributions. And it's important to realize also that because of World's failure to make the requisite contributions, it really put this pension fund in a lot of trouble. They had an $18 million withdrawal liability that they owed to the pension plan. And truth be told, and it's here in the administrative record, that assuming that the appellants are entitled to these additional pension payments, if the fund was actually forced to make those payments, according to the actuary and in the administrative record, it would put the fund in a state of insolvency. And then that would mean that the PBGC would take over the fund, and the appellants would get less money than they're actually getting now. Counsel, could you explain to me why you would never show your records to the plaintiffs, the records of contributions? You just sent an auditor's report. They wanted to see the actual records? I think the claim came in, the trustees received the claim, went back to fund counsel, the funds actuary, and the fund administrator to see if there was any truth to the allegation that these monies were paid. But ordinarily, in a case at law, we show our evidence, right? The trust, show your evidence, I'm sorry, Your Honor, to whom? To the plaintiffs. They asked to see the records. All they asked to see was the records of whether there was a contribution or not. I think those records are not as simplistic as it sounds. I mean, this is years of contribution records made by the employer to the fund. That was reviewed independently by the actuary, and it was determined that the contributions paid in were the contributions owed for the time, the work being performed during the time that the employer had the obligation. They weren't asking to audit the fund's records. All they were asking to do was to try to ascertain whether this $700,000 on behalf of a discrete number of employees had been made. And it looks like you all took the position that we have no record of that, and that's why, at least to my mind, the 1996 letter looms large. The 1996 letter, Your Honor, was a promise made on behalf of the union, not the pension fund. And with respect to the request that appellants made on the administrative level was to sit down with the funds, have the pensioning bargaining team sit down with the pension fund's actuary and pour over a contribution. So you're telling me that the pension fund had no interest in figuring out whether the $700,000 had been actually paid or not? I agree with you, Your Honor, that they did. And I think that they looked at the records to see whether or not the $700,000 had been paid, and they reported to their trustees that it had not. And the trustees only have to act reasonably with respect to the administration of the claim. Did anybody see the letter at page 112 of the record? Did your clients see that? Did the trustees review the letter, the 1996 letter? I believe that it was sent by Mr. Schwartz, and the trustees took it seriously and went back and did the investigation and determined. So the results of the investigation, and correct me if I'm wrong, was that you saw no indication that this money had ever been paid? Correct. And invited the plaintiff to submit further information as to say why they assumed that it was paid. How could they submit further information if you had the records? Doesn't it seem upside down? You asked them to submit further information, and you wouldn't turn over the records. What we did was check our own records to make a conclusion to report back to the trustees. In reasonable reliance of the planned professional's report back to the trustees that there was no indication of this contribution within the records, the trustees made a reasonable determination that the money was never funded, and on that basis would leave undisturbed their case. And the records would support your position. Why didn't you ever turn them over? At the time, the trustees did not determine that it was necessary to turn over records which only show the absence of a contribution. But why didn't you do it? They asked for it. It seems reasonable to me. I don't know this, the way the pension plan or the union works. They asked to see the records to confirm for their own benefit that no contributions were made, and you kept refusing to do so. The trustees felt that the review performed by the plans actuary and the recommendation that was made to the trustees or the information that was given to the trustees that no such contribution ever existed, that that was adequate for them to make a determination at the administrative level that the claim should be denied. Okay, thanks very much. Thank you. All right, Mr. Hoffman. Good afternoon, Your Honors. If it pleases the court, my name is Andrew Hoffman, and I represent Local 210 in this matter. In this case, the plaintiffs alleged in their amended complaint state tort and contract claims against Local 210. The district court found that those claims, despite the way that they were pled, were in fact duty of fair representation claims. And applying the six-month limitation period set forth by the United States Supreme Court and Del Costello, found them to be untimely and dismissive. So in 1996, let me see if I can follow your argument and help me understand. Yes, Your Honor. So in 1996, your client sends these people a letter saying, in effect, that, you know, welcome to the union, welcome to the pension fund. We've paid the $700,000, so your past credits are taken care of. And it's your position that if they've had – and then it turns out those representations were not true. It's your position that any claim in respect to those circumstances was a claim subject to the six-month duty of fair representation? Yes, Your Honor. Limited limitations? Yes, Your Honor. Under longstanding precedent, these claims involve the union's status as the collective bargaining representatives of these individuals. And the claim reduced to its essence is that certain promises were made in collective bargaining and that they turned out not to be true. Now, in order for a court to adjudicate those claims, it is necessary to interpret what is in the collective bargaining agreement. Were the claims made? Were which claims made? I mean, were the – was $700,000 paid, excuse me? By the union? Or by – as far as – Well, we would have no knowledge with respect to whether World paid it or not because they make their contributions directly to the fund. With respect to this claim – Did the union promise that it would pay – your client promised that it would pay $700,000? I would respectfully suggest absolutely not. If you read that letter in the vernacular – I'm sorry, Your Honor. If you read that letter in the – Hold on a second. Let's just look at the letter. What does this mean, this sentence, the penultimate paragraph, page A112? This pension plan has a cost to the union of over $700,000, which we are willing to pay to secure a better tomorrow for our new members. Your Honor, in the vernacular in 1996, before people became a little bit more sophisticated, unions did not distinguish between the union itself and their plan. Hence, the name of this plan was Local 210's Pension Fund. It is obvious that when they were talking about the cost to the union, was the cost to the members of the union who were already participants in the fund and where the fund would have to extend credits in order to give them retroactive contributions. Proof of that, Your Honor, is the second argument that we have in this case,  and that is it is plainly unlawful for a union to make contributions on behalf of its members. It violates the LMRDA, and ERISA specifically provides that plans must comply with their own governing documents. What does this mean when you say, which we are willing to pay to secure a better tomorrow for our new members? Who is the we you're referring to? Referring where, Your Honor? In the line that Judge Poole just read to you. I believe they're referring to the membership of the union who are all participants in the plan, who all have a stake in the plan, and when the plan itself extends and is providing coverage that isn't paid for, it is costing everyone in the plan a proportional share of that unfunded liability. Now, I think in 2016, people are a little bit more sophisticated, and they understand that a pension plan is a separate legal entity, but in the Teamster vernacular in 1996, it was common for the plan and the union to be referred to commonly, and there's no other way to read that letter because the plan- It says $700,000, which we, on your letterhead, are willing to pay to secure a better tomorrow for our new members. Correct? Isn't that what it says? Again, but it's referring to the union, and it's poorly written, but it certainly can't be suggesting that the union, out of its own treasury, would make contributions on behalf of members. Why not? That would be patently illegal. How would they know that? The plan itself provides- Yeah, but how would they know that? How would individuals know that? Yeah. Sounds like a scam. The person who received this letter doesn't have the command that you have of the labor statutes? I doubt that they did. Yeah. So why isn't this plausibly a claim for some form of misrepresentation? Well, I think that's how it's been pled, but the point, Your Honor, is that it is bound up with collective bargaining. It's certainly a duty of fair representation allegation, but the fact is that plaintiffs waited two and a half years to assert this claim after they were advised in writing that their benefits had been canceled. These claims don't threaten the CBA. Remember they talked about family resemblance? This claim has more of a family resemblance to ERISA than to the policy undergirding the six-month statute of limitations where we want labor peace, we want to be able to get on. This is more like an ERISA claim. Well, Your Honor, I would concede that it doesn't disturb a contract that's 20 years old, but it certainly has the potential if it had been asserted back when it was first, you know, back close in time to the time the contract was negotiated. These kinds of claims absolutely can undermine the collective bargaining relationship. But here we are. The collective bargaining agreement existed before these plaintiffs joined the union or joined the pension plan, correct? There's no question of labor peace, there's no need to settle this quickly, and it looks like an ERISA claim to me. Well, the company's out of business, so there's certainly no potential for their having any disruption of labor peace. But from a policy perspective. That's right. The policy underlying the six-month statute is to get these people together and provide labor peace. That's why it's such a short statute. But this type of claim, Your Honor, which requires an interpretation of the collective bargaining agreement, had it been asserted close in time, could very easily have disrupted the collective bargaining relationship. But they relied on this language. Why would they assert a claim when they were assured everything is okay? They were assured that you would make the payment if World Airways didn't. So how could they have made a claim before it existed? Well, they could have made a claim within six months of the time that they knew, and they instead waited two and a half years. Right. And I really think that it seems more like an ERISA claim than a DFR claim. Well, I would respectfully submit, again, the only consideration that's being alleged by the plaintiffs here to support this alleged promise is that they agreed to ratify the collective bargaining agreement. You can't possibly analyze. I mean, they're arguing on one hand that the union promised that they negotiated a contract that would compel World to pay it. So obviously, if the contract that Local 210 negotiated compelled World to provide these benefits, then they have no claim against Local 210. In order to analyze that first point, you have to look at the collective bargaining agreement. Okay? And, again, that is what underlies the policy considerations that were expressed by the court in Del Costello and the need for a short limitations period. This is completely... Until these members of your union rubbed up against a retirement age and had to figure out what their pension was, I mean, what incentive would they have to assume or investigate whether your client did what it had promised? The timing of this case was not caused by anything that happened between the employees and the union. The timing of this case was because World filed for bankruptcy and sought to discharge its withdrawal liability, $18 million. That's the only reason here that this matter was raised. Had they not discharged this huge withdrawal liability, I don't think anybody would be here. Counsel, you're aware that plaintiffs urge us to follow the Third Circuit on the statute of limitations? The Adams case? I certainly do, and I would respectfully suggest that the Adams case involves internal union matters. And did not take place... It had to do with a grievance settlement, and it did not take place within the context of collective bargaining. I think the courts have made it very clear that where claims are completely bound up in collective bargaining, irrespective of the unique circumstances in this case, where it didn't arise until 20 years later, as a policy matter, where it's bound up in collective bargaining, you need to have a quick resolution. To allow a collateral attack a year or two later is a recipe for industrial disaster. The Adams court said that speed and finality are most critical where the disputed issue is intertwined with the day-to-day relationship between management and labor. But since plaintiffs' claims involved pension contributions, not the day-to-day working environment, the Third Circuit found that the policy considerations designed to minimize delay did not apply. That sounds like this case. Your Honor, I would respectfully suggest that the reason the court found that in Adams was because it did not take place within the confines of collective bargaining agreement. It was a grievance settlement that affected the funding of a plan. Here, no trial court could possibly analyze this case without thoroughly interpreting the collective bargaining agreement. And that is the danger to industrial peace. The question here is simply whether the promise to make the $700,000 was made and whether it was kept. It's not hard. Well, Your Honor, if the union successfully... District courts can do, in our circuit, can do that in a day or so. But the allegation, Your Honor, is that the union would either get a contract that compelled World to provide those benefits, or if World didn't provide them, then the allegation is at least that the union would provide it. So you first have to determine whether the collective bargaining agreement compelled World to provide them. I produce the letter. The plaintiff's case would take about... If I were trial judge, plaintiff's case would take half hour. Thank you, Your Honor. Thank you. All right, Mr. Schwartz. I was going to raise the Gould case, but Your Honor did. Because I do think that the... What's the remedy, Mr. Schwartz, that you want from us? What's the decree of the Court of Appeals that you think is appropriate here? I think the decree is to vacate the judgment and remand it to the district court. It's a 12B6 motion. There should have been discovery. It should have been tried. The vernacular of the day, I don't... You know, certainly on a 12B6 motion, I never even heard this vernacular before. I've been a labor lawyer for 38 years. The union is the union, and the fund is the fund. And there was the other letter at page 109, which says that... It says three paragraphs from the bottom. Our union and the members of our local who will vote to accept us into their plan are willing to accept the liability to protect and make a long-term commitment to represent us. And this is a letter sent also by the Teamsters. So I think it should be remanded. I also think page 109, three paragraphs from the bottom. It's another exhibit. Local 210 says it's time to draw the line, meaning move forward. I think this should be remanded. There should be discovery both into the agreement, into the record, and into what was going on with the union if there's such a dispute. And we're not asking you to take the record and give us... We didn't move for summary judgment. Which statute of limits apply is a question of law. Okay, so I think that there the court has to say that a three-year statute of limitations of the ERISA, I think, is the most appropriate one. You have to read when the Supreme Court said, hey, hey, DFR, we're not going to always apply DFR to every dispute between a member and their union. We're not going to apply Del Castello, sorry. And the courts have come up with, including this circuit, have come up with various statutes of limitations to apply in the context of different disputes. This is not a dispute affecting the ongoing day-to-day relationship between an employer and a union and the collective bargaining relationship, and therefore should not have been subjected to a six-month... Also just to argue that it would affect the pension plan, which it would, but... Well, any ERISA claim would affect the pension plan. So, therefore, ERISA would be the most appropriate statute of limitations. And we didn't sit on this. We actually treated it like an ERISA case. I wanted you to follow through on that, on the three-year statute. Can you give us the timeline that you think is relevant? Okay, so the world had its bankruptcy in December 2012. It didn't go out of business. And it was shortly thereafter that the various plaintiffs got a letter from the fund canceling their benefits in February 2013. I wrote the first of a series of letters to the fund asking if we could just look at the books. This was very disturbing to our clients. We had letters back and forth. That lasted until March 2014 when we finally got a decision. So we treated it like exhausting your remedies under ERISA, which is to appeal to the fund board, to the administrators of the fund. The record shows it took until March 2014. There was some delay because Hurricane Sandy closed my office and their office down for a while. And they said, we deny your claim. And then we filed suit in, I believe, February 2015. So it was really 11 months after we finished exhausting the remedies. And less than three years after the bankruptcy. About two years after they were told that their benefit was being reduced. Thank you. Thank you. Thank you very much, Mr. Schwartz.